**WELLWOODS DEVELOPMENT COMPANY, Plaintiff,**

v.

**CITY OF AURORA, et al., Defendants.**

No. 85 C 8182.

United States District Court,
N.D. Illinois, E.D.

March 19, 1986.
Supplemental Opinion March 27, 1986.

Eugene Sherman, Sherman & Gray, Chicago, Ill., for plaintiff.

Arthur C. Thorpe, Richard T. Wimmer, Klein, Thorpe & Jenkins, Ltd., Chicago, Ill., Ronald R. Moses, Aurora, Ill., for City of Aurora.

Donald S. Sime, Louis W. Brydges, Jr., Brydges, Riseborough, Morris, Franke & Miller, Waukegan, Ill., for Air Aurora.

Michael E. Kerpan, Bishop & Crawford, Ltd., Oak Brook, Ill., for Philko Aviation.

Sidney Gold, Wheeling, Ill., for Priester Aviation.

G. Alexander McTavish, James D. Skaar, Ruddy, Myler, Ruddy & Fabian, Aurora, Ill., for Lumanair, Inc.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Wellwoods Development Company ("Wellwoods") has sued City of Aurora ("City") and four fixed-base operators (collectively "Operators") doing business at City's municipal airport ("Airport"): Lumenair Aviation ("Lumanair," the proper spelling as reflected in later pleadings), Philko Aviation, Inc. ("Philko"), Air Aurora, Inc. ("Air Aurora") and Priester Aviation ("Priester"). Complaint Count I charges a violation of Sherman Act § 1, 15 U.S.C. § 1 ("Section 1") and seeks:

1. treble damages, costs and attorneys' fees from Operators; and

2. injunctive relief against City.

Count II, a pendent state-law claim, asks for a writ of mandamus directing City to institute condemnation proceedings against a parcel of Wellwoods' real estate.

Each defendant has now moved for dismissal under Fed.R.Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, the motions are granted and not only the Complaint but also this action are dismissed.

*Facts* [1]

Wellwoods owns various real estate parcels adjacent to the Airport (¶ 7). City owns and operates the Airport (¶ 4). Operators provide goods and services to Airport users (¶ 6).

In May 1985 Wellwoods reached an agreement in principle to sell part of its real estate to an unnamed purchaser ("Purchaser") interested in setting up as an Operator at the Airport. That agreement was contingent on Purchaser's obtaining necessary permits to construct facilities at the Airport and to have access to its runway (¶ 8). City told Purchaser it would not issue those permits (¶ 9).[2]

Wellwoods asserts the permits were denied as the result of a conspiracy among City and Operators to keep new Operators from entering the Airport's market—a violation of Section 1.[3] That alleged conspiracy has prevented Wellwoods from selling its real estate to would-be Operators and from developing the real estate for other uses requiring Airport access. When the deal with Purchaser went sour, Wellwoods

---

**1.** Familiar Rule 12(b)(6) principles require this Court to accept as true the Complaint's well-pleaded factual allegations, drawing all reasonable inferences in Wellwoods' favor. *Wolfolk v. Rivera*, 729 F.2d 1114, 1116 (7th Cir.1984). All citations to the Complaint will simply take the form "¶ —."

**2.** Wellwoods does not allege Purchaser actually applied for the permits. It says instead (¶ 9):

Plaintiff's potential purchaser was told by the Defendant, CITY OF AURORA, through its agents, that any application for the permits required to establish a fixed base operation would be denied.

Nothing really hangs, though, on the distinction between such a statement that any application

would be fruitless and the actual denial of an application. For simplicity in discussion, this opinion will therefore speak in terms of "denial."

**3.** Section 1 provides in relevant part:

Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

Wellwoods brings this action under 15 U.S.C. §§ 15 and 26, which respectively provide private rights of action for treble damages and for injunctive relief against violations of the "antitrust laws."

says it was damaged to the tune of $1,560,-000 (¶¶ 10, 12).[4]

City has promulgated a "master plan" (the "Plan") for the Airport's development and expansion. But no date has been set for implementation of the Plan, which calls for condemnation of part of Wellwoods' Airport-adjacent real estate. Meanwhile City has refused to permit Wellwoods to develop its property[5] and has imposed certain restrictions on the property's use, decreasing its attractiveness to prospective purchasers and limiting Wellwoods' ability to sell (¶¶ 17–20). City has refused to initiate condemnation proceedings leading to an award of just compensation as provided by Ill. Const. art. I, § 15 (¶ 21).

### City's Motion

City argues principally for immunity from antitrust liability. *Parker v. Brown,* 317 U.S. 341, 350–52, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943) established the Sherman Act's nonapplicability to the trade-restraining actions of "sovereign" state governments—not as a matter of immunity in the strict sense, but on the ground Congress never intended the states' regulatory actions to fall within the Sherman Act's scope.

■ *Parker* on its own terms did not apply to *municipal* action (*City of Lafayette, Louisiana v. Louisiana Power & Light Co.,* 435 U.S. 389, 408, 412–13, 98 S.Ct. 1123, 1134, 1136–37, 55 L.Ed.2d 364 (1978) (plurality opinion)). Nevertheless municipalities may sometimes be the medium through which state regulatory action is expressed by delegation. When that is the case, municipal action inherits the state's immunity on a pass-through basis (*Community Communications Co. v. City of Boulder, Colorado,* 455 U.S. 40, 51, 102 S.Ct. 835, 840–41, 70 L.Ed.2d 810 (1982)).

Thus municipalities *as such* are not exempt from the antitrust laws. See *Fisher v. City of Berkeley, California,* —— U.S. ——, ——, 106 S.Ct. 1045, 1047–49, 89 L.Ed.2d 206 (1986) ("The ultimate source of that immunity can be only the State, not its subdivisions"). As *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985) teaches:

> It is therefore clear from our cases that before a municipality will be entitled to the protection of the state action exemption from the antitrust laws, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy.

Hence this opinion must focus inquiry on whether or not the activity of which Wellwoods complains has been authorized through a clear expression or articulation of state policy.

*LaSalle National Bank of Chicago v. County of DuPage,* 777 F.2d 377, 381 (7th Cir.1985) has expanded on what that means:

> Although the cases have not clearly defined the parameters of this "clear articulation" test, they have provided some guidance. It is not sufficient that a state merely have granted local governments general authority to govern local affairs, *see City of Boulder* ... (holding state's home-rule law not to constitute "clear articulation" of state policy to displace competition in cable television market). On the other hand, the state need not specifically authorize conduct with anti-competitive effects, *Town of Hallie,* 105 S.Ct. at 1718. It is sufficient that anti-competitive effects are a foreseeable consequence of engaging in the authorized activity. *Id.* at 1718–19. In considering the ... alleged conspiratorial acts we will first determine whether any state legislative act(s) authorizes the chal-

---

**4.** Nothing in the Complaint indicates a rationale for the sum claimed (certainly the amount Wellwoods would have received had the sale gone through would be an inapt measure of damages, and in any event the ad damnum clause (¶ 12(B)) asks this Court to determine the extent of Wellwoods' loss). Here too the open issue is not one that affects the outcome.

**5.** Wellwoods does not say just how City has refused to permit development.

lenged conduct and then determine whether anticompetitive effects are a foreseeable result of the authorization. An affirmative determination to both questions will lead us to conclude that the state intended the localities' challenged conduct to be exempt from federal antitrust laws.

Part two of the *LaSalle National Bank* test (the foreseeability of anticompetitive effects)—which might initially seem redundant—is necessary because *Town of Hallie* does not require the state to give explicit authorization to anticompetitive effects (105 S.Ct. at 1718):

> It is not necessary, as the [plaintiffs] contend, for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects. Applying the analysis of *City of Lafayette*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), it is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.

*Town of Hallie, id.* at 1718–19 contrasted such delegation of authority to construct and fix the limits of sewage systems with the general grant of home-rule powers at issue in *City of Boulder.* Though the latter type of delegation was obviously a sweeping transfer of power from the state to municipalities, its very breadth made it "neutral" with respect to potential anticompetitive effects, because each municipality was free to regulate or not as it saw fit. As *City of Boulder*, 455 U.S. at 56, 102 S.Ct. at 843, put it:

> Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of "clear articulation and af-

firmative expression" that our precedents require.

"Clear articulation" thus lies along the spectrum between a general grant of power to regulate and an explicit statement of anticipated anticompetitive effects. In a somewhat different locution, state legislatures cannot "be expected to catalog all of the anticipated effects" of legislation (*Town of Hallie*, 105 S.Ct. at 1719), but need only "contemplate[ ] the kind of action complained of" (*id.*, quoting *City of Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138).

Admittedly such dichotomous statements are not much help in deciding cases. Absent a clear legislative statement (or, lacking that, a meaningful legislative history[6]), the ascertainment of what was "contemplated" by the collective entity we label a state legislature is much like a process of divination from birds' entrails. That may be why *LaSalle National Bank*, 777 F.2d at 383 has restated the inquiry in objective foreseeability terms:

> *Town of Hallie* does not require that the legislature expressly authorize conduct with a subjective anticompetitive purpose. Rather, it is only necessary that the legislature authorize the objective conduct ... that foreseeably results in the anticompetitive effect.

Without doubt City has met the first part of the *LaSalle National Bank* test. Ill. Rev.Stat. ch. 24, ¶ 11–101–1[7] provides:

> The corporate authorities of each municipality may establish and maintain public airports either within or without the corporate limits of the municipality and provide for the safe approach thereto and take-off therefrom by aircraft; may construct, reconstruct, expand and improve landing fields, landing strips, hangars, terminal buildings and other structures and may provide any terminal facilities for such airports; ... may let to any person, or grant concessions or privileges

---

**6.** Because the Illinois General Assembly has no regularized legislative history in the traditional sense, that aid to ascertaining legislative intent is less available in this state than with most legislatures.

**7.** All further references to the Illinois statutes will take the form "ch. —, ¶ —."

in, any land adjoining the landing field or any building or structure on such land for the shelter, servicing, manufacturing and repair of aircraft, aircraft parts and accessories, for receiving and discharging passengers and cargo, and for the accommodation of the public at such airport; may regulate the use of such airports, the navigation of aircraft over such airports and the approach of aircraft and their take-off from such airports. This section is subject to the provisions of the Illinois Aeronautics Act, as heretofore and hereafter amended.

Wellwoods does not (as it cannot) dispute the scope of authorization embraced by the language permitting City to "grant concessions or privileges" to Operators and to "regulate the use of" the Airport. But Wellwoods says the statute does not meet *LaSalle National Bank's* second criterion because it is "neutral" as to anticompetitive intent.

That argument does not follow the cases' teachings. *City of Boulder's* grant of home-rule powers was held "neutral" because it was a blanket authorization to enact ordinances, with no particular purpose in view other than a transfer of power. In total contrast, *Town of Hallie*, 105 S.Ct. at 1718–19 specifically rejected the contention that a statute giving cities the power to regulate sewers was "neutral" just because that power could be exercised through either anticompetitive or free-market conduct. That was not "neutrality" in the Court's view. Rather, the specific grant of power to regulate sewer-system construction "foreseeably" resulted in anticompetitive effects on the sewage-treatment industry, even though that was not the inevitable result of the state's legislation.

Under normal language usage, ch. 24, ¶ 11–101–1 is really a fortiori instance of that principle. City's unqualified power to "grant concessions or privileges" could equally foreseeably be exercised in favor of an unlimited number of Operators, or in favor of a small group that meet specified criteria, or in favor of a single such Opera-

tor who would thus acquire a monopoly grant like that of a public utility (the paradigm of the anticompetitive example in the usual sense of that term).

*LaSalle National Bank* provides a further rationale supporting the same conclusion. There our Court of Appeals recognized that statutes authorizing local governments cooperatively to provide sewage treatment were backed by the "commonly recognized" proposition that economic competition among municipalities is "one of the chief obstacles to pollution control" (777 F.2d at 382). Thus a statute prompted by pollution-control concerns has an especially foreseeable anticompetitive impact (*id.*).

Very much the same may be said of ch. 24, ¶ 11–101–1. Though that statute itself contains no express statement of purpose, it is specifically made "subject to the provisions of the Illinois Aeronautics Act," which contains the following "declarations" (ch. 15½, ¶ 22.25) (emphasis added):

It is hereby declared that *the purpose of this Act is to further the public interest and aeronautical progress by providing for the protection and promotion of safety in aeronautics;* by cooperating in effecting a uniformity of the laws relating to the development and regulation of aeronautics in the several states; by revising existing statutes relative to the development and regulation of aeronautics so as to grant to a state agency such powers and impose upon it such duties that the state may properly perform its functions relative to aeronautics and effectively exercise its jurisdiction over persons and property within such jurisdiction, may assist in the promotion of a State-wide system of airports, may cooperate with and assist the political subdivisions of this State and others engaged in aeronautics, and may encourage and develop aeronautics; by establishing uniform rules and regulations, consistent, so far as practicable, with Federal rules and regulations, *in order that those engaged in aeronautics of every character may so engage with the least possible restric-*

*tion, consistent with their safety and with the safety and the rights of others*

. . . .

Safety is both literally and figuratively placed first and last in that legislative recital of purpose. Clearly it is ranked as the number-one priority for Illinois aeronautics, so much so that even the aspiration toward "the least possible restriction" of aeronautics is specifically limited by safety concerns. It is certainly foreseeable that a municipality could conclude that safety, like pollution control, would be adversely affected by the unrestrained play of market forces among the participants in the activity. This Court need not speculate on the role Operators play in maintaining the safety of aircraft and the Airport itself. It is enough to recognize that the state's directive to operate in a manner putting safety first has foreseeable anticompetitive effects.

Wellwoods responds by pointing to ch. 24, ¶ 11–103–5: [8]

> The corporate authorities of a specified municipality may make all reasonable rules and regulations, for air traffic and airport or landing field conduct, and for the management and control of the municipality's airport or landing field and other air navigation facilities and property under their control. These rules and regulations shall not be in conflict with the laws of the state, or the ordinances of the municipality, or the laws or regulations of the United States, or the regulations of the Illinois Commerce Commission, or the rules, rulings, regulations, orders or decisions of the Department of Transportation.

Wellwoods Mem. 3–4 says:

> One can only conclude from this provision that the Illinois General Assembly consciously intended that the airport op-

eration practices of municipalities be subject to federal antitrust scrutiny.

That might well be an attractive inference but for the existence of ch. 24, ¶ 1–1–10:

> It is the policy of this State that all powers granted, either expressly or by necessary implication, by this Code, other Illinois statute, or the Illinois Constitution to non-home rule municipalities may be exercised by those municipalities notwithstanding effects on competition.
>
> It is further the policy of this State that home-rule municipalities may (1) exercise any power and perform any function pertaining to their government and affairs or (2) exercise those powers within traditional areas of municipal activity, except as limited by the Illinois Constitution or a proper limiting statute, notwithstanding effects on competition.
>
> It is the intention of the General Assembly that the "State action exemption" to the application of federal antitrust statutes be fully available to municipalities to the extent their activities are authorized by law as stated herein.

Of course that statement of policy and intention cannot alone serve the purpose apparently intended by the legislature: *Town of Hallie* and *LaSalle National Bank* require at least the authorization of specific conduct with foreseeable anticompetitive effects before the state-action exemption will pass through to municipalities. But that is not the issue. More to the point, the specific language of ch. 24, ¶ 1–1–10 surely negates the more attenuated inference Wellwoods seeks to draw from ch. 24, ¶ 11–103–5: In the face of the former, the latter's general requirement of fidelity to the "laws and regulations of the United States" cannot be stretched as Wellwoods would have it.[9] See *Richard Hoff-*

---

8. Ch. 24, ¶¶ 11–103–1 to 11–103–17 are provisions specifically applicable to airports for municipalities with "a population of less than 500,-000" (the Illinois General Assembly's familiar device for setting different criteria for Chicago and the rest of the state, without at the same time violating the Ill. Const. art. 4, § 13 ban on special legislation). Aurora fits the less-than-500,000 description.

9. This should not be misunderstood as a general license to municipalities to act inconsistently with federal law. In the special instance of the antitrust laws, their applicability turns on the State legislature's intent. As to that, no arguable implication of the ch. 24, ¶ 11–103–5 language can override the plain statement of intent in ch. 24, ¶ 1–1–10.

*man Corp. v. Integrated Building Systems, Inc.,* 581 F.Supp. 367, 372 (N.D.Ill. 1984) (relying on ch. 24, ¶ 1–1–10 to buttress a conclusion of municipal immunity).

Finally, Wellwoods points to ch. 24, ¶ 11–103–6, which allows municipalities to lease "air navigation facilities" [10] for more than one-year terms only on competitive bidding. That requirement has a procompetitive thrust. But even if that provision were applicable here (as it is not for the reason discussed in the next paragraph), the bidding and leasing procedures come into play only after a municipality has exercised its right to determine how many and what sort of lessees will best serve its needs. Nothing in ch. 24, ¶ 11–103–6 requires City to lease property to any would-be lessee who walks in the door.

There is, however, an even more compelling response to Wellwoods' contention (though City has not made that response, see n. 10). Ch. 24, ¶ 11–103–6 by its terms applies only to the circumstances under which a municipality turns over *its* property for use by private parties. That direct cession of sovereignty over public property is permitted only under the familiar model of competitive bidding and for a limited term. But here the Complaint deals not with City's property but with *Wellwoods'* —indeed, with property Wellwoods wants to *sell* to another private party (Purchaser). Only a "permit" is mentioned in the Complaint: Wellwoods has not alleged either that any of the Operators presently operates under a lease of City's property or, more importantly, that Purchaser sought such a lease. Thus the limited scope of ch. 24, ¶ 11–103–6's procompetitive features simply does not bear on Wellwoods' case.

■ In sum, City is entitled to the benefit of Illinois' state-action exemption from

antitrust liability. City has not provided an ironclad demonstration of the "state of mind" of the General Assembly (a fiction at best), but *Town of Hallie* and *LaSalle National Bank* do not require open-and-shut proof of state legislative intent. If that seems at odds with Sherman Act policy, Congress has recently indicated it is not. See H.R.Rep. No. 965, 98th Cong., 2d Sess. 2–3 and passim, *reprinted in* 1984 U.S. Code Cong. & Ad.News 4602, 4603 and passim (accompanying Local Government Antitrust Act of 1984, 15 U.S.C. § 34–36, which immunized municipalities entirely from antitrust damages liability).[11]

As to Count II, Wellwoods Mem. 7 candidly concludes its jurisdictional basis vanishes upon City's dismissal from Count I. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) states the general rule:

> Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Pendent jurisdiction is of course a doctrine of discretion (*id.*). Here no special circumstances call for retaining jurisdiction over a claim based on a provision of the Illinois Constitution and concerning localized real estate interests. Wellwoods is free to seek the desired mandamus relief in the state courts, and its federal claim against City has dropped out very early in this litigation. See *United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Commission,* 760 F.2d 155, 160 (7th Cir. 1985). Count II is dismissed for lack of subject-matter jurisdiction.

### *Operators' Motions*

All Operators have moved to dismiss Count I, asserting various propositions.[12]

---

**10.** City has not responded at all to Wellwoods' argument based on ch. 24, ¶ 11–103–6. This Court must assume City does not dispute Wellwoods' implicit contention that Operators run "air navigation facilities" as defined by ch. 15½, ¶ 22.9. This opinion therefore accepts that proposition arguendo.

**11.** City has also challenged Wellwoods' standing to assert an antitrust claim because Purchaser, not Wellwoods, was denied the permit. This opinion discusses that issue later, in the context of Wellwoods' claims against Operators.

**12.** Initially Air Aurora moved to dismiss based on Wellwoods' lack of standing. Lumanair then moved to dismiss, adopting Air Aurora's Memo-

228

Their common ground is Wellwoods' lack of "standing" to bring this antitrust action. They are right.

This Court's colleague Judge Prentice Marshall has accurately observed in *Warner Management Consultants, Inc. v. Data General Corp.*, 545 F.Supp. 956, 961 (N.D.Ill.1982):

> The law of antitrust standing is something less than a seamless web. In fact, as we have had occasion to observe previously, this area of the law is rife with "doctrinal confusion."

In substantial part that confusion stems from the distinction between Article III case-or-controversy "standing" (satisfied by a plaintiff's showing of palpable financial loss) and the very different animal labeled "antitrust standing." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983) put the matter in these terms:

> As commentators have observed, the focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.

And whether or not a plaintiff is a "proper party" to sue for treble damages under 15 U.S.C. § 15 turns on whether its injury was "of 'the type that the statute was intended to forestall'" (*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977), quoting *Wyandotte Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967)). As *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697 went on to say (emphasis in original):

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Accord, *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 708 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984). Finally, *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 reminds us (emphasis in original):

> The antitrust laws, however, were enacted for "the protection of *competition*, not *competitors*," *Brown Shoe Co. v. United States*, 370 U.S., at 320 [82 S.Ct., at 1521].

■ Those somewhat circular and epigrammatic pronouncements may be more easily stated than applied. Real-world applications are, however, aided by a review of some basics. Clearly the private cause of action created by the Clayton Act was not simply a displacement of state tort law but rather an incentive to plaintiffs (spurred on by the prospect of treble damages) to help vindicate the public interest in free competition while remedying their own losses (*Brunswick*, 429 U.S. at 486 n. 10, 97 S.Ct. at 696 n. 10). And the public has no special interest in seeing an individual business turn a profit. What does concern the public in antitrust terms is the free operation of competitive markets. See *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334 (7th Cir.1986) ("antitrust injury" means "injury from higher prices or lower output"). Injuries amounting only to an individual's loss of profits or prospective business advantage are not "antitrust injuries," and the

randum of Law. Lumanair later submitted a separate Memorandum asserting 15 U.S.C. § 36 (part of the Local Government Antitrust Act of 1984) required dismissal. Philko then adopted Air Aurora's and Lumanair's Memoranda as well as City's, adding as a ground for dismissal the *Noerr-Pennington* doctrine. Finally Priester

moved to dismiss, adopting all the previously-filed Memoranda. Only Air Aurora's motion has been fully briefed pursuant to a briefing schedule set by this Court. Because it is dispositive of the entire action, this opinion need not reach any of the other arguments.

sustaining of such harms alone is not an entry ticket to enforce the public interest in competition via the Clayton Act. *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 516 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983).

*Associated General Contractors* illustrates the distinction. There (459 U.S. at 522–23, 103 S.Ct. at 900–01) certain building contractors allegedly conspired to coerce landowners and other contractors to deal only with nonunion contractors and subcontractors, with the purpose of restraining union contractors' trade and interfering with the plaintiff unions' business activities. Although the Court assumed (*id.* at 528, 103 S.Ct. at 903) the conspiracy violated the antitrust laws by restricting free choice in the competitive contracting market, it nonetheless observed (*id.* at 529, 103 S.Ct. at 903–04):

> Even though coercion directed by defendants at third parties in order to restrain the trade of "certain" contractors and subcontractors may have been unlawful, it does not, of course, necessarily follow that still another party—the Union—is a person injured by reason of a violation of the antitrust laws within the meaning of [15 U.S.C. § 15].

Then the Court went on to hold (*id.* at 546, 103 S.Ct. at 912–13) the union did *not* have antitrust standing.

It should be observed *Associated General Contractors* poses a very different problem from the one that led the Supreme Court to reject antitrust liability in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). There the alleged antitrust violator could have been subjected to multiple liability had a cause of action for "indirect purchasers" been recognized. One identifiable type of damage flowed from the anticompetitive activity (an overcharge to a direct purchaser), and the right to recover for all that damage was restricted to the direct purchaser— even though part or all may have been passed on to others in the chain of distribution.

*Associated General Contractors* contrasts with that situation, and it parallels this one. In *Associated* plaintiffs did business with union contractors whose business was harmed by a conspiracy in restraint of trade. When the union contractors lost business, so did the unions. Unions were less profitable and effective as a result. But those losses were, in enforcement terms, at least one step too many removed from the claimed antitrust injury: the diminution of competition in the contracting industry. And the unions were held not to have "antitrust standing" even though (1) they suffered real damages and (2) those damages were quite separate from the damages sustained by the targets of the conspiracy, the contractors.

█ Here Complaint ¶¶ 9 and 10 allege a conspiracy among Operators and City to keep others from entering into competition with Operators. As a result Wellwoods is not able to get the best possible price for its land, which is—it may be assumed arguendo—more attractive to potential Operators than to any other purchasers. But that injury is an injury to Wellwoods' bottom line in the form of lost potential gains or interference with prospective business advantage. It is not an injury to the competition targeted by the claimed conspiracy. Nothing in the antitrust laws is intended to ensure high profits—rather the opposite. See *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697.

█ Wellwoods Mem. 3 concedes it is not a competitor in the Operator market, but it says "the market for developing property adjacent to the airport" is the relevant market here. But "relevant market" in that sense is not really relevant to the issue now under scrutiny. What is significant in drawing an analogy to *Associated General Contractors* is that real estate *ownership* is not the locus of the alleged antitrust violation here. *Use* of property by Operators' prospective competitors is.[13]

13. Wellwoods Mem. 3 says ¶¶ 3, 7 and 10 "de-
scribe[ ]" the "relevant market." That is inaccu-

True enough, Wellwoods' claimed injury might be viewed as lying in a "direct" line of causation from the asserted conspiracy. But once again the parallel to *Associated General Contractors* applies, for Wellwoods' alleged injury is no less direct than the injury suffered in that case by the unions, which were prevented from selling their members' labor because their customers were frozen out of business.[14] Lack of "antitrust standing" for the unions translates directly into lack of such standing for Wellwoods.

Wellwoods seeks to rely on general language suggesting broader antitrust standing in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982):

> As we have recognized, "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236 [68 S.Ct. 996, 1006, 92 L.Ed. 1328] (1948).

But obviously that excerpt cannot be taken in its literal all-encompassing sweep—for example it does not even except the *Parker* doctrine. And in any event the language and holding of *Associated General Contractors*, a later case, must be viewed as limiting such inconsistently broad language in the earlier *Blue Shield* opinion.

To fit this case into the framework marked out by *Blue Shield* and *Associated General Contractors*, the former must be examined just as the latter has been. In *Blue Shield*, plaintiff ("McCready") held a Blue Shield health insurance policy providing reimbursement for psychotherapy by psychiatrists but not psychologists. McCready's claims for psychological treatment costs were "routinely denied" (457 U.S. at 468, 102 S.Ct. at 2543). She alleged Blue Shield had conspired with a psychiatrists' association to put psychologists out of the psychotherapy market, the result of which was denial of her claims (*id.* at 469–70, 102 S.Ct. at 2543–44). She was not herself a competitor in the psychotherapy market, nor presumably was Blue Shield interested in bankrupting *her*. Nonetheless the Court found (*id.* at 479, 102 S.Ct. at 2548) the injury to her was not only "foreseeable" but also "a necessary step in effecting the ends of the alleged conspiracy." That was so because the conspirators' modus operandi was to strike at psychologists through Blue Shield's customers, denying claims and thus making psychologists' services less attractive to patients. In other words, a loss to the plaintiff was purposeful—it was essential to produce the intended loss to defendants' competitors. In that sense McCready's injury was "inextricably intertwined" with the psychologists' injury (*id.* at 484, 102 S.Ct. at 2551). See *Associated General Contractors*, 459 U.S. at 538, 103 S.Ct. at 909, (emphasizing the "inextricably intertwined" nature of plaintiff's injury in *Blue Shield* ).

By contrast, if we take Wellwoods at its word (as we must on the current motions), City denied a permit to a prospective Operator precisely because the applicant intended to become an Operator. Wellwoods' existence or nonexistence was immaterial to that intention. All the claimed conspirators would have acted exactly as they did whether Purchaser was the owner of the property, or its lessee, or its contract buyer, or (as here) its prospective purchaser. In short, the intended harm to an applicant

---

rate both factually and legally. ¶¶ 3 and 7 simply set out Wellwoods' ownership and desire to sell real property adjacent to the Airport. But ¶ 10 specifically alleges a conspiracy designed to exclude new Operators or others who require Airport access, and Wellwoods' only Count I claim complains it is precluded from "selling to or developing its property for fixed base operators or other uses requiring airport access" (*id.*).

14. In fact the unions alleged the conspirators' principal intent was to strike at the unions themselves (459 U.S. at 525, 103 S.Ct. at 901–02), while here there is nothing to suggest a general purpose to interfere with Wellwoods, so long as Wellwoods did not sell to an Operator.

need not involve Wellwoods or any other adjacent landowners at all.

*Blue Shield's* "inextricably intertwined" phrase must be understood as describing the situation in which the patients were direct targets of the conspiracy—the intended victims through which the ultimate goal of harming the conspirators' competitors was hoped to be accomplished. *Blue Shield*, 457 U.S. at 479, 102 S.Ct. at 2548 made that precise point:

> Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends.

That was not so in *Associated General Contractors*, and it is not so here. Though the unions and the contractor target-victims may have been "intertwined," their tie was not "inextricable" in *Blue Shield* terms: Unions sustained only an incidental sideswipe effect of the head-on collision between the competing contractors.[15] Ours is really an a fortiori case. Wellwoods and Purchaser may be "intertwined" too, but their tie is even less "inextricable": Unions were necessarily *present* (and thus necessarily received the sideswipe) in *Associated General Contractors*, but the presence here of a property seller (as distinct from, and in addition to, a prospective Operator) to receive a comparable sideswipe was not at all necessary to the head-on collision between competing Operators.

In the end, *Purchaser* is the direct "antitrust" victim of the alleged conspiracy, not Wellwoods. To adapt Justice Stevens' language in *Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. at 910–11 to this case:

> The existence of an identifiable class of persons whose self-interest would nor-

mally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as [Wellwoods] to perform the office of a private attorney general. Denying [Wellwoods] a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.[16]

No doubt, on the Complaint's allegations, Wellwoods has suffered a loss. But—it must be repeated—the antitrust laws do not exist to enable individual vendors to get the best price for their property. Other laws may provide remedies for the type of injury Wellwoods alleges. Let it seek them out.

### Conclusion

Both City's and Operators' motions to dismiss are granted in their entirety. This action (save for any state law claims capable of reassertion in a court of competent jurisdiction) is dismissed with prejudice.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This Court's March 19, 1986 memorandum opinion and order (the "Opinion") dismissed this action, in part on grounds of immunity from antitrust liability on the part of defendant City of Aurora ("City"). Within the next few days the then-current weekly edition of West's *Federal Case News* carried a one-paragraph summary of the decision in *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91 (2d Cir. 1986), which appeared to have obvious relevance to the municipal immunity issue.

---

**15.** Like all metaphors, this creates the peril of muddying rather than clarifying matters. In an ordinary collision, the innocent bystander who is sideswiped may sue and recover because he or she has sustained an injury. But the lesson of *Associated General Contractors* is that in the world of antitrust, a comparable innocent bystander has not sustained an *antitrust* injury— does not have "antitrust standing" to sue and recover.

**16.** Justice Stevens' footnote just preceding that quotation (*id.* at 542 n. 47, 103 S.Ct. at 910 n. 47) might well be paraphrased too:

> Indeed, if there is substance to [Wellwoods'] claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right.

This Court has now obtained and read the *Montauk-Caribbean* opinion. That case, like this one, involved a suit by a disappointed fixed-base operator charging antitrust violations by a municipality that owns and operates the local airport. New York, like Illinois, has a statute permitting municipal airport operation and specifically authorizing the municipality to grant concessions or privileges to private operators. Though the language of the two statutes differs somewhat, those differences are immaterial for purposes of applying the "clear articulation" test drawn from *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985) and expanded (at least for this Circuit) by *LaSalle National Bank of Chicago v. County of DuPage,* 777 F.2d 377, 381 (7th Cir.1985).

Suffice it to say that *Montauk-Caribbean,* 784 F.2d at 95–96 employed precisely the same analysis as did the Opinion, holding that *Town of Hallie* foreclosed antitrust injunctive relief against the municipality there. *Montauk-Caribbean* thus provides added support for the conclusion reached in the Opinion as to City.