SCOTT W. HOLZRICHTER, Plaintiff-Appellant, v. THE COUNTY OF COOK *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—90—3372

Opinion filed June 18, 1992.—Rehearing denied October 27, 1992.

Scott W. Holzrichter, of Chicago, appellant *pro se.*

Wildman, Harrold, Allen & Dixon, of Chicago (Douglas R. Carlson, Elizabeth A. Sanders, Kirk B. Johnson, and Michael L. Ile, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Scott Holzrichter, was injured in an automobile accident and underwent corrective surgery in 1982. The pending, *pro se* lawsuit joins nine defendants. The medical malpractice aspect of his lawsuit joins Cook County Hospital and six individual physicians who operated upon him or otherwise treated him in 1982. Plaintiff also sues the law firm he retained to investigate his legal rights and remedies arising from the automobile accident that caused the traumatic injuries for which he underwent the surgeries in question. Plaintiff further joins the American Medical Association (AMA) in a count brought pursuant to the Illinois Antitrust Act (Act) (Ill. Rev. Stat. 1981, ch. 38, par. 60—1 *et seq.*). The antitrust claim against the AMA was dismissed pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—615), and it is from this dismissal that plaintiff appeals. The trial court held that plaintiff failed to state an antitrust cause of action and also held that any such claim was time-barred under the four-year statute of limitations found in the Act. The court then entered a finding pursuant to Supreme Court Rule 304(a) that there was no just cause to delay enforcement of or appeal from that ruling. 134 Ill. 2d R. 304(a).

On appeal, plaintiff contends that he states an actionable claim against the AMA under the Illinois Antitrust Act. He also asserts broad and wide-ranging challenges to trends or patterns in health

care services and costs, which he attributes to the AMA's control and influence over the marketplace of such services.

Because we agree with the trial court that plaintiff fails to state a legally recognizable cause of action against the AMA, we affirm the dismissal of the AMA from plaintiff's lawsuit. We also hold that the claim is time-barred.

BACKGROUND

In January 1982 plaintiff was injured in an automobile accident and spent three months at Cook County Hospital. He underwent a bilateral craniotomy. In his complaint he charges that defendant Cook County and its agents and employees were negligent in losing or failing to restore "one roughly four square-inch cranial-bone tissue specimen from above [his] left ear resulting in a craniectomy being performed." Plaintiff alleges that this procedure was accomplished without authorization by a guardian and in violation of "the standard required guidelines." Plaintiff alleges that he was not subsequently informed of the surgery. He also alleges that the attending physician failed to monitor and maintain proper positioning of his left clavicle (broken in the accident), which resulted in improper mending and an attendant impairment of the functioning of his left shoulder.

Plaintiff asserts that he discovered the surgical removal of the cranial bone a month after his release and that subsequent cosmetic cranioplasty to replace the bone resulted in the loss of "proximally located muscle." Plaintiff alleges that during the first three months of 1982, when he was being treated by several different doctors, some of the doctors told him to wait five years before seeking further remedial procedures. They allegedly told plaintiff that no further medical intervention was needed at the time because natural healing was progressing normally.

In mid-1983, plaintiff retained a law firm, Paul B. Episcope, Ltd. Although a pleading in the record indicates the firm was hired to prosecute an action against the automobile driver involved in the collision, plaintiff also claims the firm was to analyze his medical malpractice claim and take whatever measures necessary to protect his rights. Plaintiff authorized the firm to acquire his medical records, which they obtained in November 1982. In January 1983 plaintiff met with members of the law firm to discuss his case.

Plaintiff alleges that he waited the suggested five years and determined that his physical recovery was unsatisfactory. He then contacted the law firm to add a count based on a theory of fraudulent concealment of malpractice claims. The law firm refused.

Plaintiff asserts that he discovered omissions and falsifications in his medical records, which the law firm had perused years earlier and should have discovered.

On December 22, 1989, plaintiff filed the pending lawsuit, *pro se*, in three counts. The AMA was joined in July 1990. In the amended complaint filed in 1990, plaintiff claimed that the law firm was negligent in its handling of the case. According to plaintiff, the firm failed to adequately investigate the facts surrounding the medical treatment he received and further failed to inform him in 1983 of the discovery rule and the outside four-year limitations provision applicable to medical malpractice actions. As a result, plaintiff claims that he lost all legal remedies and his ability to pursue the case other than as a *pro se* plaintiff.

Plaintiff's claim against the AMA is not easy to state, or even completely understand. In essence, it appears that he accuses the AMA of promulgating or encouraging practices among its member physicians that led to a conspiracy of silence which in turn prevented plaintiff from learning about his possible causes of action against the doctors for medical malpractice. In support of his antitrust claim against the AMA, plaintiff cites a number of means by which he says the AMA restrains trade and "muddle[s] the healthcare marketplace toward taking virtually all control away from the ultimate consumer, i.e., the patient, in restraint of a free market in violation of Sections 3(1)(b) and 3(1)(c) of the Illinois Antitrust Act." Using plaintiff's labels and terms, we summarize these challenges as follows:

(1.) Uninformed, vulnerable health care consumers are easy prey for oppressive tactics. Plaintiff asserts that the individual doctor works in a marketplace with a large number of consumers who are often "routinely unenlightened" as to the services they need. One of the five elements of a market conducive to collusion, according to authority cited in plaintiff's brief, is having "a large number of small, poorly informed buyers." Presumably, this allows the doctors to set the rates and decide what the patient is to pay for treatment.

(2.) Public policy inveighs against perpetuation of "institutional negligence" in health care. Plaintiff cites a 1928 law review article regarding the tort liability of charities and the role of charities in society. He states that "to the extent the AMA membership is buffered and shielded from free-enterprise market forces is the extent that that institution takes on a semblance of charity status with the responsibilities it ushers." Apparently, plaintiff is advocating judicial recognition of a public interest theory to hold the AMA responsible for the negligence of its member physicians.

(3.) The AMA is fostering a "trend to specialize" among its members that is responsible for a "reduction in the overall quality of healthcare." This specialization allows the AMA to "pay short shrift to such public policy concerns." As we understand plaintiff's position, one danger of specialization is to curtail the number of general practitioners who may be better able to serve more patients by recognizing a wider range of symptoms and "predisposing causes" of diseases that might not produce illness for years.

(4.) The AMA "historically has controlled the supply of healthcare practitioners and has maintained a chronic shortage—conducive to collusion." Doctors are being encouraged to specialize as they realize attendant benefits of specialization.

(5.) "The AMA influences the insurance industry's payment policies." Plaintiff suggests that insurance carriers may condition payment of certain claims on the patient's being treated by a board-certified specialist, which further encourages the specialization of physicians.

(6.) "AMA controls its membership's work environment." Specialists enjoy such privileges that they may be less accountable to the patient population and therefore less responsive. Plaintiff suggests that specialists are out of touch with the range of health disorders in the community and have less concern with satisfying the patient. According to plaintiff, the AMA is responsible because it controls the governing boards of insurance companies and has an active legislative lobby. As a result there has been little incentive to reduce costs of health care.

(7.) The AMA influences "the price its membership pays for medical malpractice insurance which the Plaintiff suggests had a significant influence in prompting the tacit collusion of its membership against the Plaintiff in the 1982 concealment of Plaintiff's cause of action while a consumer in the healthcare marketplace." This argument is directed at a policy of determining malpractice insurance premiums based on medical specialties and geographic locations instead of an experience-based rate for individual doctors. Plaintiff suggests that the AMA has exerted a dominant force in this insurance rating system, which spreads the cost of malpractice insurance equally among its members in a given specialty and geographic area while eliminating an economic incentive that would otherwise reward a member who practiced "quality healthcare." Apparently, the essence of this problem is to reward the incompetent at the expense of the competent. According to plaintiff, moreover, all physicians have an in-

centive to protect against malpractice claims brought against any doctor, so as to keep their own premiums lower.

(8.) The AMA's control over the legislative lobby has resulted in the shortening of statutes of limitations.

Plaintiff's concern centers on the "insidious" trend of doctors to specialize, which he believes promotes an out-of-touch attitude toward patients, less accountability, and a health care marketplace that is less responsive to patients' needs. Legislation that shortens the time patients may sue further dilutes the rights of patients by providing a disincentive for doctors to provide quality health care. Doctors will conceal other doctors' malpractice to keep their own premiums down. In conjunction with the control the AMA has over malpractice insurance ratings, these factors "ultimately minimize or eliminate the effects of economic market forces that would otherwise quash an insidious trend to specialize."

OPINION

This appeal does not involve the merits of plaintiff's medical malpractice action. Nor is the claim against the law firm in issue on appeal. Instead, we must determine whether the complaint alleges conduct on the part of the AMA that is actionable under the Illinois Antitrust Act. The timeliness of the antitrust count is also in issue. The trial court, holding that the four-year limitations period barred the action, also rejected plaintiff's attempt to toll the running of the limitations period based on fraudulent concealment or equitable estoppel.

In granting the motion to dismiss the AMA, the trial court stated that what plaintiff had "basically and essentially [was] a cause of action against the doctors who treated [him]." Whatever deficits there may have been in plaintiff's medical treatments were attributable to the individual acts and omissions of individual doctors. Similarly, if the defendant law firm rendered negligent legal advice and thereby foreclosed an action under the pertinent statutes of limitation, the law firm's failure to discover a cause of action cannot be attributed to the AMA. Plaintiff seems to say that the AMA itself fraudulently concealed his cause of action by encouraging a conspiracy among AMA members. Under the conspiracy, which was motivated by a desire to keep medical malpractice premiums down, member doctors supposedly would counsel persons in plaintiff's position to wait five years before seeking additional treatment.

The complaint lacks any specific factual allegation to substantiate such a supposition, however. Instead of actual facts connecting plain-

tiff's injury to specific acts of the AMA, plaintiff engages in a sweeping indictment of the state of health care in this country. The courts are limited, however, to determining whether defined violations of law have occurred under a specific set of facts, on a case-by-case basis.

■ Under section 3 of the Illinois Antitrust Act it is unlawful for someone to:

"(1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:

a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties thereto, or the fee charged or paid for any service performed or received by the parties thereto;

b. fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect stated in paragraph a. of subsection (1);

c. allocating or dividing customers, territories, supplies, sales, or markets, functional or geographical, for any commodity or service; or

(2) By contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce; or ***." Ill. Rev. Stat. 1981, ch. 38, par. 60—3.

■ Violation of the Act requires a combination or conspiracy between competitors or potential competitors to accomplish an anticompetitive objective. (*Adkins v. Sarah Bush Lincoln Health Center* (1989), 129 Ill. 2d 497, 521, 544 N.E.2d 733.) Plaintiff does not identify in his pleading the nature of the conspiracy or the persons or entities who entered an illicit agreement to fix or control prices or services. Instead, he asserts in conclusory fashion that members of the AMA, his treating doctors, somehow conspired to keep him in the dark about his actual medical condition. What is lacking, however, are any facts leading to a reasonable inference that the AMA through its membership engaged in collusive practices to commit unlawful acts in restraint of trade. Even if individual doctors concealed information from plaintiff or misled him in an attempt to defeat his malpractice actions, plaintiff does not articulate specific acts, statements or directives from the AMA that would support the contention that the AMA perpetrated or joined in such a conspiracy to harm or control the health care market by concealing malpractice.

■ At oral argument plaintiff spoke of the AMA's "policy" regarding malpractice insurance: the decision to allocate malpractice premiums in accordance with geographical districts and areas of expertise, rather than on an individualized basis pegged to a doctor's personal background and experience. Even assuming such a practice may be a restraint of trade or fit within an antitrust theory, plaintiff does not assert that the AMA actually underwrites insurance policies that individual companies issue to member physicians. The AMA does not provide medical malpractice insurance, and presumably it is the insurers themselves who set the policy and formulate the risks. To the extent the AMA exerts an influence over insurance boards or legislative lobbying, plaintiff does not explain how that is an illegal restraint of trade.[1]

■ To the extent plaintiff contends that the individual doctors— merely by their common membership in the AMA—colluded or conspired to keep plaintiff ignorant of his condition, the law is to the contrary. (See *Federal Prescription Service, Inc. v. American Pharmaceutical Association* (D.C. Cir. 1981), 663 F.2d 253, 265, *cert. denied* (1982), 455 U.S. 928, 71 L. Ed. 2d 472, 102 S. Ct. 1293 (mere membership in an association is not enough to establish participation in a conspiracy with other members of the association under antitrust law).) We are not suggesting that the AMA is immune to antitrust actions, in a proper context. For example, in a case cited by plaintiff, *Wilk v. American Medical Association* (7th Cir. 1983), 719 F.2d 207, the plaintiffs were chiropractors who alleged that the AMA had suppressed competition by refusing to recognize plaintiffs' specialty as a legitimate form of health care. The court agreed with plaintiffs that trial error had resulted in the deprivation of their right to a fair trial and the matter was remanded for a new trial. See also *Blue Shield v. McCready* (1982), 457 U.S. 465, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (Cognizable antitrust claim asserted by plaintiff health care consumer

---

[1]In his brief plaintiff explains the nature of the action as being his attempt to seek damages arising out of the AMA's "violation of the Illinois Anti-Trust Act, Ill. Rev. Stat. 1981, ch. 38, par. 60—1 et seq., by way of AMA's allegedly far-reaching, dendritic presence which side-lines established avenues of societal control ranging from informal peer pressure, to formal peer review, to free-market enterprise forces, and to the legal system's last-resort overview functions of the healthcare industry. The arrested social control over the AMA's conduct is to the detriment of the health-care environment to which Plaintiff's proximate exposure allegedly caused same substantial injury, and continually threatens the demographic group to which Plaintiff was associated, and is actionable against as a matter of public policy on anti-trust grounds."

against an insurer and a group of psychiatrists; nature of the conspiracy was to put psychologists out of business by denying insurance claims of patients like plaintiff, whose psychotherapy was performed by psychologists instead of psychiatrists).

Unlike the situation in *Wilk* or *McCready*, the pending claim does not involve specific group action in which one segment of the market or competition is favored over another to the detriment of the plaintiff. The AMA's influence over its members and its lobbying for changes in the law does not automatically equate with antitrust violations. Certainly, legislative lobbying has long been recognized as a legitimate part of the governing process protected under the first amendment rights of citizens to assemble and petition the government. (See *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.* (1961), 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523; *United Mine Workers v. Pennington* (1965), 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (which collectively gave rise to the "*Noerr-Pennington* doctrine").) Under this doctrine, group solicitation of government action is generally insulated from Federal antitrust liability, even if the influence or action might have anticompetitive effects, because of the first amendment protections. Although the doctrine is not unlimited, the basic right of the AMA to lobby for legislation it deems favorable is constitutionally protected.

■ As we understand plaintiff's position, he deplores the growing trend toward specialization and what he perceives as a resulting erosion of the doctor-patient relationship. His conclusory charge that the AMA has fostered such a situation for illegal purposes under the antitrust laws, however, does not withstand analysis. In fact, it is questionable whether plaintiff has the type of standing conferred by the pleading of an "antitrust injury," or one that harms the public's interest in free competition by suppressing rather than promoting competition. (See *Wellwoods Development Co. v. City of Aurora* (N.D. Ill. 1986), 631 F. Supp. 221, *aff'd* (7th Cir. 1987), 822 F.2d 1091.) In *Wellwoods* the court discussed the nature of an antitrust injury and distinguished it from the type of injury that only affects an individual's lost profits or prospective business opportunities. The plaintiff in that case was a land owner who wished to sell for development parcels surrounding a municipal airport. The plaintiff filed an action against the city, the airport, and airport operators who allegedly combined to prevent him from selling his land to new operators who would open businesses in competition with the existing ones. The court dismissed the action, holding that plaintiff lacked antitrust

standing because he merely alleged personal economic harm as a land owner rather than actual injury to competition.

Under section 7(2) of the Illinois Antitrust Act, a person may bring a civil action if he "has been injured in his business or property, or is threatened with such injury, by a violation of Section 3 of this Act." (Ill. Rev. Stat. 1981, ch. 38, par. 60—7(2); see also *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters* (1983), 459 U.S. 519, 535, 74 L. Ed. 2d 723, 736, 103 S. Ct. 897, 907; *Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc.* (1977), 429 U.S. 477, 488, 50 L. Ed. 2d 701, 712, 97 S. Ct. 690, 697.) The pleading of a recognized antitrust injury is an essential element of the action and also provides the plaintiff's requisite standing. In *Kling v. St. Paul Fire & Marine Insurance Co.* (C.D. Ill. 1986), 626 F. Supp. 1285, plaintiff doctors sued an insurer and a hospital whose alleged agreement required all dentists and doctors with staff privileges to carry a minimum of $1 million in medical malpractice coverage. The plaintiffs argued that the agreement would require them to incur increases in premiums and that it would artificially and unfairly increase the cost of health care while diminishing the quality of the care. Those plaintiffs claimed an injury to their own business. In ruling that they failed to state an antitrust injury, however, the trial court noted that the allegations of economic harm affected only the doctors, not competition within the marketplace. The court held that antitrust laws are to protect competition rather than competitors and that the injuries alleged were not the type of harms covered under the antitrust laws.

In the pending case, plaintiff has not stated how his business or property was injured or threatened by specific restraints of trade. Nor has he otherwise shown that his injury resulted from harm to the competitive process itself.

Instead of a true competitive injury to the marketplace, here plaintiff alleges generalized harms to the consumers of patient care, whose ability to seek and receive quality treatment at reasonable costs has been damaged, allegedly, by the AMA's control over its member doctors and its influence over the legislative process. With respect to his own medical treatments, plaintiff states that he suffered physical deformations; loss of respect by his employer and fellow employees; loss of opportunity for new employment; prejudice and social stigma; and mental pain and suffering. The antitrust injury he sustained, presumably, was the result of the conspiracy of silence fostered by the AMA to deter patients from asserting malpractice claims.

Clearly, plaintiff's physical and mental suffering, however severe and unfortunate, is not the type of "marketplace" injury normally compensable under the antitrust laws. His damages are for personal injuries and he does not set forth any solid factual link between the doctors' supposed concealment of plaintiff's inchoate malpractice claims and specific acts of the AMA as an organization. The public interest in more efficient and less expensive health care is great; however, the AMA's stance with respect to doctor specialization or malpractice insurance is not legally relevant either to plaintiff's physical injuries or to his claim that certain of his treating physicians concealed matters that would sustain a medical malpractice action. We conclude that the complaint fails to allege an antitrust injury under the law.

■ Plaintiff's broad and general objections to the AMA's role in lobbying for certain legislation or advocating specialization among its members is not within the courts' power to address in the abstract, moreover. Plaintiff's challenges to the system of medical care in this country may be well taken. Apparently, some of his arguments have been advanced in various publications and it is evident that plaintiff has spent a substantial amount of time researching what he believes are glaring, systemic flaws in the medical community's care and treatment of patients. Such challenges are better directed to the legislature, however, because that body is the one charged with attempting to balance competing social values within the political process through debate and assimilation of diverse information. Presumably, not everyone would agree that doctor specialization is bad. Some might argue that general practitioners lack the time and ability to keep abreast of emerging developments in numerous fields of medicine. We, as a judicial body, lack authority to render an advisory opinion on the good or evil of doctor specialization.

■ The fact that plaintiff received similar or substantially the same medical advice from different doctors does not necessarily mean, as plaintiff urges, that the AMA conspired among its members to induce him to delay bringing a medical malpractice action. The so-called "conscious parallelism" of different doctors' opinions might as easily be the result of similar medical judgments based on the physical symptoms and the doctors' training and experience. Not all injuries can be fully healed and not all surgeries can guarantee restoration of damaged bones and tissue. Therefore, the mere fact that plaintiff's medical problems persisted after five years does not necessarily mean medical malpractice occurred. But even assuming that the complaint adequately sets out a conspiracy or combination to conceal possible

malpractice claims, we fail to see how the mere fact that the doctors were members of the AMA means that the AMA promulgated the policy to conceal malpractice claims. Nothing can be inferred from the complaint beyond vague notions that the AMA promotes "invidious" specialization and lobbies for preferential legislation.

Moreover, there is a serious question raised regarding the timeliness of the action. Under the pertinent section of the Illinois Antitrust Act, civil actions for damages must be brought within four years after the accrual of the cause of action. (Ill. Rev. Stat. 1981, ch. 38, par. 60—7(2).) The alleged medical malpractice occurred in 1982, eight years before the AMA was joined in the lawsuit. Anything the treating physicians might have done to discourage plaintiff from filing suit following the initial treatment occurred within months thereafter, or no later than 1983. The AMA's purported responsibility for fostering a conspiracy of silence directed at this plaintiff, therefore, goes back to 1982 and 1983.

Even if the treating doctors fraudulently concealed or falsified material information from plaintiff, nothing in the complaint specifies any affirmative steps the AMA took to aid and abet the doctors in concealing plaintiff's cause of action arising out of the medical treatment. (See, *e.g., Smith v. Cook County Hospital* (1987), 164 Ill. App. 3d 857, 862, 518 N.E.2d 336 (to invoke the fraudulent concealment exception to the statute of limitations, plaintiff must set forth *affirmative* acts or words of the defendant that prevented plaintiff from earlier discovering the claim or filing it).) At most, plaintiff seems to be saying that the AMA's influence over insurers and legislators caused economic pressure on the doctors through their fear of rising malpractice insurance premiums, which in turn led to their dissembling conduct toward plaintiff. That is not, however, the type of active and knowing concealment of a particular cause of action that might toll the running of the limitations period.

Plaintiff's attempt to circumvent the four-year statute of limitations through an equitable estoppel argument is also unavailing. (See, *e.g., Dodd v. Cavett Rexall Drugs, Inc.* (1988), 178 Ill. App. 3d 424, 436, 533 N.E.2d 486.) Even if the individual doctors, as members of the AMA, collusively concealed the true nature of plaintiff's condition, plaintiff did not in fact rely on what any one or all of the doctors counseled. He sought out more than one doctor's advice (and it is the similarity of their opinions which led to the conspiracy theory in the first place).

Plaintiff did not wait five years to act, moreover, and therefore did not rely to his detriment on the alleged misrepresentations or

omissions of the doctors, let alone any conduct of the AMA. Instead, within months of his injury and treatment he sought a legal evaluation of his rights and possible remedies. Plaintiff discussed his case with lawyers, ordered his medical records, and presumably took an active role in informing his lawyers of the nature of his injuries and subsequent treatments. If the law firm's acts or omissions amounted to legal malpractice, a matter not in issue in this appeal, plaintiff could seek damages against the firm for any provable losses flowing out of that malpractice. If the law firm were found responsible for his losing a valid claim against the doctors, plaintiff would be entitled to recover the value of that claim in damages from the law firm. In any event, we find no facts in the record or legal authority to support a relaxation of the statute of limitations in this case, and any suggestion that the AMA should be equitably estopped from asserting that affirmative defense is meritless.

We conclude that plaintiff fails to plead a recognizable violation of the Antitrust Act and, further, that any such claim he might have is time-barred.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.

