## LaSALLE NATIONAL BANK OF CHICAGO, et al., Plaintiffs-Appellees,

v.

## The COUNTY OF DuPAGE, et al., Defendants-Appellants.

### No. 84–2684.

United States Court of Appeals, Seventh Circuit.

Argued June 14, 1985.

Decided Nov. 18, 1985.

Rehearing and Rehearing En Banc Denied Jan. 16, 1986.

Richard J. Hoskins, Schiff, Hardin & Waite, Chicago, Ill., for defendants-appellants.

James P. Chapman, Chicago, Ill., for plaintiffs-appellees.

Before WOOD, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

On this appeal we must decide whether alleged anticompetitive activities of three local governmental units constitute state action and are therefore exempt from federal antitrust law under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny.

Plaintiffs, owners and developers of a 145-acre parcel of land in DuPage County, Illinois, sued the County of DuPage, its Board of Commissioners, and two municipalities located within the County—the Villages of Woodridge and Lisle—alleging that these three local governmental units conspired through a series of acts spanning a nine-year period to restrain competition among themselves for development projects in DuPage County and to restrain competition among the developers. The defendants moved to dismiss the complaint arguing *inter alia* that their allegedly violative conduct constituted "state action" and was therefore exempt from Sherman Act challenge under the "state action doctrine" of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[1] The district

---

* The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by designation.

1. Defendants also argued that the complaint should be dismissed because (1) it does not sufficiently allege an antitrust injury, (2) it does not allege that the antitrust violation has a substantial impact on interstate commerce, and (3) it concerns local government activity that the tenth amendment prohibits the federal government from regulating. The district court rejected all of these additional grounds for dismissal. In view of our finding that the complaint should be dismissed on "state action" grounds we do not address these arguments.

court denied the motion, holding that the localities' conduct did not constitute state action. The district court later certified its decision and this court granted defendants leave to take an interlocutory appeal. *See* 28 U.S.C. § 1292(b). On review we hold that the local governments' alleged violative conduct, although a close question, constitutes "state action" and is therefore exempt. Accordingly we reverse the district court order and grant the motion to dismiss.

### I.

The well-pleaded facts in the complaint, accepted as true at this motion to dismiss stage, *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1332 (7th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977) are as follows.

In 1969 plaintiffs[2] ("Developer") purchased a 145-acre parcel of unincorporated land in DuPage County near Chicago with the intention of developing the area for luxury-type housing and related commercial businesses. The 145-acre development is known as "Hobson Greene" and lies within a largely unincorporated 1,500-acre area known as the "Greene Area." Defendant DuPage County ("County"), through defendant Board of Commissioners, governs the unincorporated portions of DuPage County including the area containing Hobson Greene. The other defendants, the Villages of Lisle and Woodridge, are located within DuPage County on the eastern boundary of the Greene Area.

Developer's complaint charges that through a series of acts spanning a nine-year period (1971 to 1980) the defendants conspired to unlawfully restrain competition among developers in DuPage County and the Chicago metropolitan area and competition among local governmental units who seek to annex, to tax, to zone, and to provide utility services to developments. The complaint breaks the conspir-

acy down into three components, one involving zoning, another sewage, and the third water and annexation.

*Sewage:* In or about 1971 the County and the Villages decided to consolidate the ownership and management of their various sewage treatment facilities. To this end the County purchased the sewage treatment facilities of each of the Villages and agreed to provide sewage treatment service to the Villages. Among the provisions in the sales agreements was one reserving for each Village the right to determine which users outside the Village would receive sewage treatment service from the sewage treatment plant the Village was selling to the County. The agreements also specified that in the event new sewage treatment connections had to be rationed the Villages would each have a right of first refusal to a certain number of connections.

The contingency contemplated in the sales agreements occurred in 1979 when the Illinois Environmental Protection Agency ("IEPA") determined that the consolidated DuPage County sewage treatment was overburdened. The IEPA sought to place a freeze on all further connections to the sewage treatment system until capacity was increased. After negotiations the IEPA agreed to allow a limited number of new connections if the County would take certain steps to upgrade its treatment facility. The County and Villages then agreed on a formula for dividing additional connections among themselves. The agreement, apparently in compliance with the 1971 sales agreements' reservation of rights clauses, allocated the new connections according to the following percentages: 38% to the Village of Lisle, 34% to the Village of Woodridge, 28% to unincorporated portions of DuPage County. The agreement was subsequently embodied in a state circuit court decree, *Corporate West Development, Inc. v. Illinois Environmental Pro-*

---

**2.** The plaintiffs include Unity Ventures, an Illinois partnership engaged in real estate development; William Alter, Unity Venture's managing partner and the beneficial owner (through land

trusts) of the 145-acre parcel at issue; and LaSalle National Bank of Chicago, trustee of the land trusts comprising the 145 acres.

*tection Agency,* No. 79 MR 257 (Cir.Ct. DuPage Cnty, August 13, 1980) (Supp.App. Rec.). The Developer was not given notice or an opportunity to be heard prior to entry of the decree even though it had preexisting valid permits for sewage service. The 28% given to the County for unincorporated areas was not sufficient to meet the needs of the Hobson Greene development. Developer petitioned the state circuit court to reconsider and grant Developer leave to intervene. The court granted Developer leave to intervene and is presently reconsidering its decree in view of Developer's due process challenge.

*Zoning:* The second component of the conspiracy involves the County's denial of Developer's petition for a special use permit for Hobson Greene. In 1970 Developer petitioned the DuPage County Zoning Board of Appeals for a special use permit that would have allowed it to proceed with the proposed luxury housing development. After conducting a public hearing the Zoning Board of Appeals recommended that the County's Board of Commissioners deny the petition for the special use permit. On December 24, 1974 the defendant DuPage County Board of Commissioners adopted the Zoning Board's recommendation to deny the petition. Developer appealed the denial and an Illinois appeals court ultimately reversed the Board's decision and found the Board's action has "little or no relation to the public health, safety and welfare of DuPage County." *See LaSalle National Bank v. County of DuPage,* 54 Ill.App.3d 387, 396, 369 N.E.2d 505, 512, 12 Ill.Dec. 8, 15 (2d Dist.1977). Although the Developer's complaint does not state whether or in what way the Villages were involved in the County's decision to deny the permit, the Developer's brief asserts that the Villages "opposed" the permit. We presume that the Villages communicated this opposition to the County.[3]

*Boundary Agreement (Water and Annexation):* The third component of the con-

spiracy is a 1978 agreement between the Villages to divide the unincorporated land lying between their borders for purposes of annexation and the provision of water service. In 1978 Developer approached the Village of Woodridge about providing water service to the Hobson Greene development. Woodridge conditioned the provision of water service on Developer's acceptance of Woodridge's annexation of the Hobson Greene development. Developer, apparently not satisfied with the terms of Woodridge's offer, approached the Village of Lisle about water service. Since Hobson Greene lies without Lisle's exclusive territory Lisle refused to deal with Developer.

## II.

We must decide whether any of these alleged agreements among the three local governmental units constitutes "state action" as that term is used in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny. The Supreme Court in *Parker,* relying on policies of federalism and state sovereignty, narrowly construed the Sherman Act to exempt a state, acting through its legislature, from antitrust liability arising from anticompetitive conduct. 317 U.S. at 350–52, 63 S.Ct. at 313–14. Several decades later, in a series of decisions, the Supreme Court considered the state action doctrine as it applies to conduct of local governmental units. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). The Court held that local governmental conduct is not necessarily exempt from federal antitrust laws since local governments, unlike states, are not sovereigns; rather local governmental conduct is exempt when taken pursuant to

---

**3.** Although this failure to allege any involvement by the Villages may in itself justify dismissal of this portion of the complaint since without such involvement there was no joint action

to ground a conspiracy, we need not decide this issue because of our decision to dismiss on state action grounds.

a clearly articulated state policy to displace competition with regulation or monopoly public service. *Id.*, 105 S.Ct. at 1716–17.

Although the cases have not clearly defined the parameters of this "clear articulation" test, they have provided some guidance. It is not sufficient that a state merely have granted local governments general authority to govern local affairs, *see City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) (holding state's home-rule law not to constitute "clear articulation" of state policy to displace competition is cable television market). On the other hand, the state need not specifically authorize conduct with anticompetitive effects. *Town of Hallie*, 105 S.Ct. at 1718. It is sufficient that anticompetitive effects are a foreseeable consequence of engaging in the authorized activity. *Id.* at 1718–19. In considering the three alleged conspiratorial acts we will first determine whether any state legislative act(s) authorizes the challenged conduct and then determine whether anticompetitive effects are a foreseeable result of the authorization. An affirmative determination to both questions will lead us to conclude that the state intended the localities' challenged conduct to be exempt from federal antitrust laws.

## III.

*Sewage:* The complaint alleges that the County and the Villages violated antitrust laws by agreeing to a formula for allocating new sewage connections among themselves in response to IEPA charges that the consolidated County treatment plants were processing too much waste. The formula agreed upon was apparently first contained in the two agreements (one between Woodridge and County, the other between Lisle and County) which effected the consolidation of the ownership and management of all sewage treatment facilities in the County. As part of the consideration for turning over ownership of their own treatment plants to the County, the Villages each reserved the right to a certain number of new connections in the event sewage treatment supply in the County became scarce. As it turned out a shortage did result when the IEPA forced the County to add new capacity and limit the number of new connections.

The State of Illinois authorizes counties and municipalities to contract together and combine resources for the provision of sewage treatment. Ill.Ann.Stat. ch. 34, ¶ 3111 (Smith-Hurd 1985 pocket part) (counties "may furnish ... sewerage service ... to municipal corporations ... [and] may enter into and perform contracts ... with any municipal[ity], ... for the furnishing ... of ... sewerage service"); Ill.Ann.Stat. ch. 24, ¶ 11–147–4 (Smith-Hurd 1962) ("Any municipality lying wholly or partly within the boundaries of any county which accepts the provisions of 'An Act in relation to water supply, drainage, sewage, pollution and flood control in certain counties,' [Ill. Ann.Stat. ch. 34, ¶ 3101–3123] may contract with such county for water supply or sewerage service to or for the benefit of the inhabitants of the municipality"); Ill.Ann. Stat. ch. 111½, ¶ 1046(b) (Smith-Hurd 1977) ("in order to be eligible for federal grants for construction of sewage works pursuant to Section 201(g) of the Federal Water Pollution Control Act Amendment of 1972 (P.L. 92–500), any municipality, county, special district or other unit of local government ... that owns or operates sewage works may adopt ... ordinances or regulations to provide for systems of proportionate cost sharing for operation and maintenance by recipients of such unit's waste treatment services.").[4] The legislature has also expressly authorized the IEPA "to engage in planning processes and activities and to develop plans in cooperation with units of local government ... in connection with the jurisdiction or duties of

---

**4.** Although paragraph 1046(b)'s syntax leaves something to be desired (the "in order to" phrase in the first clause suggests that the second clause will set forth a conditional requirement for obtaining federal grants, where in fact the second phrase uses the permissive verb "may"), we think it means that a municipality has authority to adopt proportionate cost sharing *if* they do so for the purposes of being (*i.e.*, "in order to" be) eligible for federal grants.

each such unit ...." Ill.Ann.Stat. ch. 111½, ¶ 1004(n) (Smith-Hurd 1977).

█ We think that together the statutes permitting cooperation between local governmental units for the provision of sewage treatment and the statute authorizing local units to cooperate with the IEPA in reducing water pollution constitute authorization for the allocative agreement entered into by defendants. We also see anticompetitive results are a foreseeable consequence of this authorization. It is commonly recognized that one of the chief obstacles to pollution control is the competition among governmental units, whether local, state, or national, for commercial and residential development. Such competition leads governments to relax pollution control standards resulting in environmental deterioration not only in the area where standards are relaxed but in nearby jurisdictions as well. A United States Senate Report on the Federal Water Pollution Control Act Amendments of 1972 speaks of this tension between intergovernmental competition for economic development and pollution control objectives:

> The independent functioning of units of government in areas of population concentration without regard to the pollution related requirements of other areas of the same region will not be possible. Uncontrolled growth and expansion and competition among units of government will be reduced if effective environmental controls are to be imposed.

Sen.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3704. We think it clear that the Illinois statutory scheme which encourages local units of government to cooperate among themselves and with the IEPA in the provision of sewage treatment evinces legislative appreciation of the tension between intergovernmental competition for economic development and pollution control goals, and implicitly sanctions reduced intergovernmental competition.

In sum, free competition and competitive pricing are not the policies underlying the Illinois scheme for sewage treatment. Rather the scheme is one in which local governmental units are encouraged to cooperate in providing sewage service to residences within their boundaries for the common good of the communities they serve. These local and regional decisions regarding sewage treatment are guided by political forces, minimal judicial review, *see Krol v. County of Will,* 38 Ill.2d 587, 590, 233 N.E.2d 417 (1968), and state and national environmental protection laws. Under such a scheme anticompetitive effects are clearly foreseeable and contemplated. We therefore hold that the defendants' agreement allocating sewage treatment capacity was authorized and that the Illinois legislature intended that such cooperative agreements not be the subject of federal antitrust suits.

*Zoning:* Developer alleges that the three local governmental units conspired to deny it a special use permit without which the Hobson Greene luxury-housing development could not proceed. Although Developer's complaint does not specify the nature of the two Villages' involvement in the County's decision to deny the petition for a special zoning permit, Developer's brief suggests that the two Villages somehow combined efforts to persuade the County to deny the special permit.

█ The Illinois state legislature has specifically granted counties the power to regulate zoning in unincorporated areas. Ill.Ann.Stat. ch. 34, ¶ 3151 (Smith-Hurd 1985 pocket part).[5] The legislature has

---

**5.** This power includes the power

> to regulate and restrict the location and use of buildings, structures and land for trade, industry, residence and other uses which may be specified by [the board of supervisors], to regulate and restrict the intensity of such uses, to establish building or setback lines on or along any street, trafficway, drive, parkway

or storm or floodwater runoff channel or basin outside the limits of cities, villages and incorporated towns which have in effect municipal zoning ordinances; to divide the entire county outside the limits of such cities, villages and incorporated towns into districts of such number, shape, area and of such different classes, according to the use of land

also expressly authorized counties "to *co-operate* ... with cities, villages or other municipal corporations either within or without such county" in all matters relating to zoning. Ill.Ann.Stat. ch. 34, ¶ 3159 (emphasis added) (Smith-Hurd 1960). We think that these statutes constitute State of Illinois authorization for consultation between the County and Villages regarding the Developer's special use permit petition.

We also hold that anticompetitive effects are a foreseeable result of this authorization. By definition zoning is an approach to land use which engrafts upon laissez-faire capitalism a regulatory scheme controlled by political institutions. As one commentator put it, the "grant of zoning power necessarily reflects a state determination that regulation should displace market competition otherwise protected by antitrust laws." Areeda, ANTITRUST LAWS p. 69, ¶ 212.7d (1982 Supp.); *accord Racetrac Petroleum, Inc. v. Prince George's County*, 601 F.Supp. 892, 906 (D.Md.1985) (holding Maryland zoning act to constitute a clearly articulated and affirmatively expressed state policy to displace free competition among landowners and users of land with regulation).

That the legislature foresaw anticompetitive effects and intended that the federal antitrust laws not apply to local zoning decisions is also evidenced by the purposes it delineated for zoning:

> [the promotion of] public health, safety, morals, comfort and general welfare, conserving the values of property throughout the country, lessening or avoiding congesting in the public streets and highways, and lessening or avoiding the hazards to persons and damage to property resulting from the accumulation or runoff of storm or flood waters ....

Ill.Ann.Stat. ch. 34, ¶ 3151 (Smith-Hurd 1985 pocket part). These purposes, although not necessarily in conflict with the policies of the antitrust laws, are not necessarily consistent with them either, and to that extent the legislature can be said to have foreseen anticompetitive effects.

Developer argues that the Illinois legislature has not met the clear articulation test because it did not authorize the intergovernmental cooperative effort to deny Developer the special permit *for anticompetitive purposes*, rather it authorized such conduct for the purposes delineated in the state zoning statute quoted above, Ill.Ann.Stat. ch. 34, ¶ 3151 (Smith-Hurd 1985 pocket part). Developer would require that the legislature expressly authorize both the objective conduct and the subjective anticompetitive purpose. Developer's argument does not accord with *Town of Hallie*, 105 S.Ct. 1713. *Town of Hallie* does not require that the legislature expressly authorize conduct with a subjective anticompetitive purpose. Rather, it is only necessary that the legislature authorize the objective conduct (here cooperative zoning decisions) that foreseeably results in the anticompetitive effect. 105 S.Ct. at 1718 (holding that "[i]t is not necessary ... for the state legislature to have stated explicitly that it expected the [defendants] to engage in conduct that would have anticompetitive effects," it is sufficient that the anticompetitive conduct is a foreseeable result of the authorization); *accord Town of Hallie*, 700 F.2d 376 (7th Cir.1982), *aff'd*, — U.S. —, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). True, the Illinois legislature has not expressly authorized zoning for the purpose of restraining competition, but it has authorized cooperative zoning for purposes which will at times foreseeably come into conflict with free competition; the authorization was therefore specific enough to pass the clear articulation test.

Developer also argues that the local governments' cooperative efforts to deny the special permit were not authorized because a state appeals court has overturned the County's denial of the special permit,

---

and buildings, the intensity of such use (including height of buildings and structures and surrounding open space) and other classification as may be deemed best suited to carry out the purposes of this Act; to prohibit uses, buildings or structures incompatible with the character of such districts respectively .... Ill.Ann.Stat. ch. 34, ¶ 3151 (Smith-Hurd 1985 pocket part).

holding that the decision had no relation to the public health, safety, and welfare of DuPage County or any other purpose for which zoning is authorized under Ill.Ann. Stat. ch. 34, ¶ 3151 (Smith-Hurd 1985 pocket part). *See LaSalle National Bank v. County of DuPage,* 54 Ill.App.3d 387, 369 N.E.2d 505, 12 Ill.Dec. 8 (2d Dist.1977). The question litigated in the state court—whether the County of DuPage correctly decided whether to grant the zoning petition—is quite different from the issue litigated here—whether the three governmental units had the authority to cooperate in making zoning decisions and whether anticompetitive results were foreseeable from the authorization.

Since anticompetitive effects are foreseeable results of the authorized cooperative zoning efforts we infer that the legislature intended for the local governmental cooperative action at issue here to be exempt from federal antitrust challenge.[6]

*Boundary Agreement (water and annexation):* The third conspiratorial act alleged in the complaint is the Villages' agreement to divide the unincorporated land lying between them so that each has the exclusive right to annex and to provide water service within a particular territory and to extract monopoly prices from developers within that territory who seek water service.

The Illinois Constitution, Art. VII, Section 10(a) entitled "Intergovernmental Cooperation" authorizes units of local government to "associate among themselves" to "transfer any power or function." Illinois statutory law gives localities the power to annex any unincorporated area that is contiguous to its corporate limits, Ill.Ann.Stat. ch. 24, ¶ 7–1–1 (Smith-Hurd 1985 pocket part), and to provide water service to residences outside their boundaries, Ill.Ann.Stat. ch. 24, ¶ 11–149–1 (Smith-Hurd 1985 pocket part). In agreeing to divide the unincorporated territory lying between them for purposes of water service and annexation the Villages did nothing more than "transfer" powers they had been given by the Illinois State legislature. Furthermore, the Village of Lisle's refusal to deal with Hobson Greene for provision of water pursuant to the boundary agreement is authorized by Ill.Ann. Stat. ch. 24, ¶ 11–149–1 (Smith-Hurd 1985 pocket part) which has been interpreted as authorizing localities to decline to provide water service to residences outside their boundaries. *See Exchange National Bank of Chicago v. Behrel,* 9 Ill.App.3d 338, 341, 292 N.E.2d 164, 166 (1st Dist.1972) (¶ 11–149–1's provision that municipality "may" provide for extension of municipal sewers and water main implies that such extension of service is discretionary).

This authorization to associate for the purpose of transferring power foreseeably reduces intergovernmental competition. The constitutional provision encouraging cooperation and exchange of powers in this and other areas reflects a legislative concern that competition between municipalities may not always accord with the public interest and reflects a decision that antitrust policies such as efficiency and compe-

6. Although the parties have not briefed the issue (except for a footnote reference in the State of Illinois' Amicus brief), we think that the claim regarding the zoning decision may be barred by the *Noerr-Pennington* doctrine, another exemption that the Supreme Court has read into the Sherman Act. This doctrine bars Sherman Act suits against persons who associate for the purpose of restraining trade and competition if they pursue this purpose through legitimate political means. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (limit-ing *Noerr-Pennington* to legitimate, non-abusive political conduct); *Racetrac Petroleum, Inc. v. Prince George's County,* 601 F.Supp. at 908–910 (setting forth the doctrine in greater detail). As we understand the complaint (as amended by the brief) it charges that the Villages violated the Sherman Act by associating together in an attempt to persuade the county Board to deny the special permit and that they did so for anticompetitive purposes. The complaint contains no intimation that the Villages abused the political process in seeking to convince the County to deny the special zoning permit. This sort of association for purposes of influencing governmental action would appear to be exempt from antitrust challenge under *Noerr-Pennington.*

tition should at times give way to others. *Cf. Town of Hallie,* 105 S.Ct. at 1718, n. 5 (Wisconsin statute permitting municipality to enter cooperative agreements for provision of sewage treatment has foreseeable anticompetitive effects). The authorization for municipalities to refuse to provide water service beyond boundaries also has foreseeable anticompetitive results. *Cf. Town of Hallie,* 105 S.Ct. 1713 (Wisconsin statute authorizing City to provide sewage service and giving City right to decline service to those residing beyond its boundaries has foreseeable anticompetitive effects).

Because the State of Illinois has authorized the association of municipalities for the purpose of transferring powers and authorized the municipalities' refusal to provide water service to residences beyond their borders, and because these authorizations have foreseeable anticompetitive consequences we hold that the boundary agreements constitute state action and are exempt from antitrust challenge.

For the foregoing reasons we REVERSE the district court order and remand to the district court with directions to dismiss this federal antitrust action against the defendants.