841 F.2d 770
 1988-1 Trade Cases 67,920
 UNITY VENTURES, an Illinois partnership, LaSalle National
Bank, as Trustee under Trust No. 103331, and
William Alter, Plaintiffs-Appellants,
v.
COUNTY OF LAKE, Village of Grayslake, Norman C. Geary,
George Bell and Edwin M. Schroeder, Defendants-Appellees.
 Nos. 86-1620, 86-1706.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 25, 1987.
Decided March 9, 1988.
Rehearing and Rehearing En Banc Denied May 5, 1988.
 
 Clifford L. Weaver, Burke, Bosselman & Weaver, Chicago, Ill., for defendants-appellees.
 James P. Chapman, James P. Chapman & Assoc. Ltd., Chicago, Ill., for plaintiffs-appellants.
 Before CUMMINGS and WOOD, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 The plaintiffs, Unity Ventures, LaSalle National Bank, and William Alter, sued defendants Village of Grayslake, Lake County, and three officials under the fourteenth amendment to the United States Constitution, 42 U.S.C. Sec. 1983, and the Sherman Act, 15 U.S.C. Sec. 1. The plaintiffs allege that the defendants improperly denied plaintiffs' request for sewage service in order to control the use of plaintiffs' property, violating the plaintiffs' rights to equal protection, substantive and procedural due process, and section one of the Sherman Act. After trial, the jury returned verdicts against all defendants on the equal protection, substantive due process, and antitrust claims. The court trebled the jury's award of $9,500,000 in damages under the antitrust count and on January 16, 1984, entered judgment on the verdict in favor of plaintiffs in the amount of $28,500,000. Defendants filed a timely motion for judgment notwithstanding the verdict or a new trial. On March 19, 1986, the district court granted defendants' motion for judgment n.o.v., denied their motion for a new trial, and denied plaintiffs' procedural due process claims and their request for injunctive relief. Plaintiffs have appealed, raising the following issues: (1) whether there was sufficient evidence to support the jury's finding that defendants violated plaintiffs' rights to substantive due process and equal protection; (2) whether defendants violated plaintiffs' rights to procedural due process by failing to provide plaintiffs with notice and an opportunity to be heard before denying their request for sewer hookups, and by failing to articulate standards for their decision; (3) whether the evidence supported the jury's finding that defendants' agreement on the provision of sewage treatment services eliminated competition between municipalities and between developers, in violation of section one of the Sherman Act; and (4) whether defendants' anticompetitive conduct constituted state action and was therefore immune from the antitrust laws. Defendants have cross-appealed from the denial of their motion for a new trial. We affirm the district court's judgment notwithstanding the verdict on the grounds that the plaintiffs' claims were not ripe for adjudication.
 
 I. STANDARD OF REVIEW
 
 2
 Our review of the "district court's decision to enter a judgment n.o.v. must be ... de novo." Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 15 (7th Cir.1987). We do not, however, judge the credibility of the witnesses, or substitute our judgment on the weight of the evidence for that of the jury. La Montagne v. American Convenience Prods., 750 F.2d 1405, 1410 (7th Cir.1984). Our task is to determine whether the evidence, and all reasonable inferences which may be drawn from it, is substantial enough to support the jury's verdict, "when viewed in the light most favorable to the non-moving party." Graefenhain, 827 F.2d at 15. With this standard in mind, we turn to a brief discussion of the facts of the case.
 
 II. FACTUAL BACKGROUND
 
 3
 We draw our discussion of the facts, in large part, from the district court's opinion. Unity Ventures v. County of Lake, 631 F.Supp. 181 (N.D.Ill.1986).
 
 
 4
 In 1972, Alter obtained an option to purchase 585 acres of farmland (the Unity property) in an unincorporated area of Lake County, Illinois. The Unity property was south of Grayslake and southeast of Round Lake Park. On August 15, 1976, Alter and Round Lake Park entered into an annexation agreement providing for development of the Unity property. The Village adopted an ordinance annexing the property and Alter contributed land and money to the Village for municipal facilities. Alter exercised his option to purchase the Unity property on October 21, 1976.
 
 
 5
 In 1973 Lake County completed a plan for a system of regional sewage treatment plants. Under the plan, unincorporated and annexed properties would be served through an off-site connection: an underground pipe would extend from the property or municipality to the main interceptor, a larger underground pipe that connected to the treatment plant serving that area. Two principal interceptors would serve central Lake County. The Northeast Central Interceptor was designed to serve the area of Grayslake and communities along its path to a new sewage treatment plant in Gurnee, Illinois. The Northwest Central Interceptor would serve the area of Round Lake Park and communities along its path to another new treatment plant in Fox Lake, Illinois. The Unity property, under grants approved by the Illinois Environmental Protection Agency (IEPA), the terms of the revenue bond issue, and regional construction plans, was located in the proposed Northeast Interceptor's service area.
 
 
 6
 Lake County and the Village of Grayslake agreed, on April 20, 1976, that the County would provide service to Grayslake through the Northeast Interceptor. The County granted to Grayslake jurisdiction over a "sphere of influence" including unincorporated areas in Lake County adjacent to Grayslake. The Village had the right to approve all connections to the County's Northeast Interceptor from this area. The County and the Village agreed that "[t]he County shall preserve the function of County interceptors located within the sphere of influence of the Village ... by not permitting any direct connection hereto by any person, firm, corporation or municipality unless the Village consents in writing to such direct connection." Unity Ventures, 631 F.Supp. at 185. The 1976 agreement reflected some changes in the sewage disposal arrangement that the parties had reached in 1973. The word "municipality" was an addition, and Grayslake's sphere of influence was increased to include the Unity property and a 2,500-acre parcel in unincorporated Lake County known as the Heartland property. The district court found that neither the plaintiffs nor Round Lake Park officials knew of the sphere of influence agreement between Grayslake and Lake County until October of 1978. Id. at 186.
 
 
 7
 In August of 1978 Alter submitted to the Lake County Public Works Department two plans for the construction of a connection between the Unity property and the Northeast Interceptor. One plan provided for a connection to serve only the Unity property for which Alter would pay the construction costs. The second plan provided for a connection to serve both the Unity property and the Heartland property which lay between Unity and Grayslake. Alter would pay for the bulk of this sewer with Grayslake paying only for the additional costs of oversizing to accommodate the larger area. Martin Galantha, Director of the Lake County Public Works Department, approved the plans and sent them on to Mayor Edwin M. Schroeder for Grayslake's approval according to the sphere of influence agreement. Galantha also sent a letter indicating that although Round Lake Park generally would be served by the Northwest Interceptor, the Unity property, because it lay within the Des Plaines River basin, "should be tributory [sic] to the County's Northeast Central interceptor system." Id. (quoting Plaintiffs' Exhibit 50).
 
 
 8
 The plaintiffs learned of the sphere of influence agreement on October 31, 1978, at a meeting with Galantha, Mayor Schroeder, Mayor Walter Bengson of Round Lake Park, and others to discuss Alter's proposals. Mayor Schroeder declined to consent to Unity's connection into the Northeast Interceptor at that time.
 
 
 9
 Round Lake Park appealed Grayslake's veto of Alter's requested sewage connection to the Lake County Board through Joseph Tobolik, Round Lake Park's representative on the Board. On March 16, 1979, the Board's Public Service Committee obtained a legal opinion from the law firm of Chapman & Cutler as to the propriety of Grayslake's veto power. Chapman & Cutler found the sphere of influence agreement to be of questionable legality. Because it vested Grayslake with arbitrary authority, the agreement could violate the requirements of due process and, moreover, according to the opinion, if the agreement was not considered to be an exercise of state action it might violate the antitrust laws as well. After receiving this opinion, the Public Service Committee sought the State's Attorney's advice about its legal options. Ultimately, the Committee abandoned further inquiry into the legality of Grayslake's veto power and instructed the County to take the necessary steps to support the contract's validity.
 
 
 10
 Following Grayslake's rebuff, plaintiffs and Round Lake Park proceeded with alternate plans to provide sewage treatment facilities for the Unity property. On August 29, 1976, Round Lake Park filed a petition for variance with the Illinois Pollution Control Board, requesting permission to construct a sewage treatment plant to serve the Unity property. The defendants did not file any objections. In November of 1979, the Pollution Control Board granted the variance without objection. In December of 1979, Round Lake Park entered into an agreement with a sewer company to construct the plant.
 
 
 11
 While the plaintiffs were engaged in these efforts, the developer of the Heartland property had been negotiating an annexation with Grayslake officials. In November of 1980, after several years of unsuccessful negotiations with Grayslake, the Heartland's developer sought annexation by Round Lake Park. Faced with the prospect of losing Heartland, the Grayslake Board of Trustees on December 22, 1980, adopted a resolution that Grayslake would consider allowing the Unity property to connect to the Northeast Interceptor if Round Lake Park would agree not to annex Heartland without Grayslake's consent. Round Lake Park rejected this offer on January 3, 1981, and on January 14, 1981, Round Lake Park passed a resolution to authorize Heartland's annexation.
 
 
 12
 Five days later Lake County and Grayslake filed with the IEPA objections to construction of the sewage treatment plant to serve the Unity property. The Grayslake trustees on February 2, 1981, unanimously rescinded their earlier resolution to consider allowing the Unity property to connect to the Northeast Interceptor. On June 3, 1981, the defendants filed an action in the Circuit Court of Lake County challenging the validity of Round Lake Park's zoning and annexation of Heartland. (The complaint was later amended to include a challenge to Round Lake Park's zoning of plaintiffs' property.)[1] On May 15, 1981, plaintiffs filed this suit.
 
 III. DISCUSSION
 A. Ripeness of Constitutional Issues
 
 13
 The defendants, in an early motion to dismiss, argued among other things that the plaintiffs' claims were not ripe for adjudication. The district court denied the motion. No discussion of the ripeness issue appears in the district court's opinion. Ripeness, as an element of the case or controversy requirement of Article III of the Constitution, is an issue we must address. Regional Rail Reorganization Act Cases, 419 U.S. 102, 138, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974). Since this case was tried, the Supreme Court has discussed the doctrine of ripeness on two occasions. The decisions in those cases, and a recent Ninth Circuit opinion convince us that this case is indeed not yet ripe for our consideration. MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); Herrington v. County of Sonoma, 834 F.2d 1488 (9th Cir.1987). The Ninth Circuit explained the principle behind the ripeness doctrine as follows:
 
 
 14
 In land use challenges, the doctrine of ripeness is intended to avoid premature adjudication or review of administrative action. It rests upon the idea that courts should not decide the impact of regulation until the full extent of the regulation has been finally fixed and the harm caused by it is measurable.
 
 
 15
 Herrington, 834 F.2d at 1494.
 
 
 16
 The Supreme Court's recent discussion of ripeness has been in the context of regulatory taking claims. In one such case, the Court stated that a plaintiff "must establish that the regulation has in substance 'taken' his property ... [and] that any proffered compensation is not 'just.' " Yolo County, 106 S.Ct. at 2566 (citations and footnote omitted). "[A]n essential prerequisite to a takings claim is a final decision by the government as to what use of the property will be allowed." Id. In order for a plaintiff to maintain a suit, the government's use determination must be one "which inflicts a concrete injury on the plaintiff." Kinzli v. City of Santa Cruz, 818 F.2d 1449, 1454 (9th Cir.1987). The Kinzli court has interpreted the final decision requirement to include "(1) a rejected development plan, and (2) a denial of a variance." Id. (citing Williamson, 473 U.S. at 187-90, 105 S.Ct. at 3117-19). The Ninth Circuit applied this test in Kinzli to dismiss the plaintiffs' taking claim because they had "neither submitted a development plan nor applied for a variance." 818 F.2d at 1455. The Kinzli court similarly found that plaintiffs' equal protection and substantive due process claims were not ripe, and because the substantive due process claim was not ripe there could not yet be a denial of procedural due process. Id. at 1456; see also Williamson, 473 U.S. at 199-200, 105 S.Ct. at 3123-24.
 
 
 17
 Plaintiffs here do not allege that Grayslake and Lake County have "taken" their property. They argue that the denial of a sewer connection to the Northeast Interceptor was not based on any discernible standards and violated their rights to equal protection and substantive due process. Moreover, they contend, their rights to procedural due process also were violated because they did not receive notice and an opportunity to be heard before the denial.
 
 
 18
 Although the plaintiffs' suit is not premised on a takings claim, as were the Yolo County, Williamson, and Kinzli cases, we agree with the Ninth Circuit in Herrington that the ripeness analysis used in those cases applies as well to equal protection and due process claims. Herrington, 834 F.2d at 1494. The plaintiffs in Herrington initially brought suit under 42 U.S.C. Sec. 1983 against Sonoma County asserting that the County's denial of their development plan "effected a taking of their property without just compensation." Id. at 1493. The Herringtons, like plaintiffs here, also claimed violations of their rights to equal protection and substantive and procedural due process.[2] After the close of evidence at trial the Herringtons abandoned their taking claim; the case was thus decided and appealed only on the equal protection and due process issues. We believe the Ninth Circuit's analysis of these issues is persuasive, and we adopt the reasoning of the Herrington opinion.
 
 
 19
 A final decision must be demonstrated by a development plan submitted, considered, and rejected by the governmental entity. Because plaintiffs here are challenging defendants' denial of a sewer connection, this requirement can be met by a rejected application or proposal for the connection. Plaintiffs are unable to meet this requirement. Alter's efforts to obtain a sewer connection for the Unity property did not include a formal application to either Grayslake or Lake County, and thus did not result in a final decision.
 
 
 20
 Alter submitted two plans to Martin Galantha, director of the Lake County Public Works Department. Galantha approved of the plans and sent them to Mayor Schroeder of Grayslake for the Village's approval in accordance with the sphere of influence agreement. When Alter met with Mayor Schroeder and others October 31, 1978, Schroeder, speaking with the knowledge and approval of the Board of Trustees, told him that Grayslake would not consent at that time to the Unity property connecting to the Northeast Interceptor. In a letter to the County Board Schroeder mentioned Grayslake's concerns about the sewer's capacity to accommodate the property of developers interested in annexing to Grayslake. He stated, however, that "[a]s a matter of record Grayslake has never taken the position that it will never consent to the connection by Unity Ventures." Alter made no formal application to the Village Board of Trustees. Neither did he approach the Lake County Board to apply for a connection. Nor did he file a request with the IEPA to approve a connection to the Northeast Interceptor.
 
 
 21
 Round Lake Park generally was located in the area to be served by the Northwest Interceptor. The Unity property, although tributary to the Northeast Interceptor, was politically part of Round Lake Park. Alter, however, never applied for connection to the Northwest Interceptor. Alter failed to make any effort to obtain a final, reviewable decision before any governmental entity on his application for a sewer connection. He asserts that further efforts to apply to the County, the IEPA, or the North Shore Sanitary District would have been "a useless act."
 
 
 22
 The Ninth Circuit has ruled that the final decision requirement may be met with proof that attempts to comply would be futile. Kinzli, 818 F.2d at 1454; Martino v. Santa Clara Valley Water Dist., 703 F.2d 1141, 1146 n. 2 (9th Cir.), cert. denied, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983). The Ninth Circuit, relying on Yolo County, has found that futility is not established "until at least one meaningful application has been made." Herrington, 834 F.2d at 1495; Kinzli, 818 F.2d at 1454-55 (citing Yolo County, 106 S.Ct. at 2568 n. 8). The plaintiffs in Herrington were able to establish the futility of further efforts to seek approval of their development plan. They had submitted an application to Sonoma County for a thirty-two unit subdivision. The plaintiffs' proposal included a tentative map prepared by a civil engineer, a narrative description of the project, and a filing fee. Herrington, 834 F.2d at 1491. The application was technically incomplete, however, because it did not contain the requisite environmental impact report, but instead was accompanied only by a series of environmental studies. The plaintiffs demonstrated through uncontroverted testimony that despite this technical insufficiency their plan had in fact been considered and rejected by the County Board of Supervisors. Id. at 1496. This testimony also revealed that applications for a variance would have been futile as well because variances were prohibited by law. Id. The plaintiffs thus were able to meet the requirements of a final decision without either a technically complete development plan or a rejected application for a variance. The Ninth Circuit, however, "emphasize[d] that mere allegations by a property owner that it has done everything possible to obtain acceptance of a development proposal will not suffice to prove futility." Id.
 
 
 23
 Plaintiffs here do not allege that they have done everything possible, nor can they. Although Alter testified that he believed applications to the County and other entities would be "useless," the law requires a greater legitimate effort to follow administrative procedures than plaintiffs have made. At the very least, Alter should have sought formal approval of his request for a sewer connection from the Grayslake Board of Trustees at a regular meeting. Mayor Schroeder's informal denial of Alter's request was not unassailable. He refused to approve the sewer connection "at that time." In his letter to the County Board, although the Mayor expressed concerns about the capacity of the Northeast Interceptor, he stated that Grayslake had not taken the position that it would never approve sewer connection to the Unity property. The Village's hesitation to approve Alter's application because of questions about capacity points up the rationale behind the final decision requirement. If the plaintiff had presented a formal application to the Grayslake Board of Trustees with adequate documentation about the density of the proposed development and the anticipated volume of sewage the connection would have to accommodate, then the Village could have made a reasoned decision about the Northeast Interceptor's ability to handle the excess. And if the Village still denied the application, a court would have a basis on which to evaluate the impact and extent of the Village's denial. At this point, it is simply impossible for a court to determine how the Grayslake Board of Trustees or the Lake County Board would have acted on a formal application, or whether or to what extent the plaintiffs have been harmed.
 
 
 24
 The plaintiffs' claims are, unfortunately at this late date, not ripe for adjudication. The plaintiffs have not obtained a final decision on their application for a sewer connection; indeed, they have failed even to present a formal application to either the Village of Grayslake or Lake County regarding the Northeast Interceptor. They have failed to seek a connection to the Northwest Interceptor as well. They have not persuaded us that submitting a formal application would be futile--we have nothing but their assertions to demonstrate futility. This is not enough. Plaintiffs' equal protection and substantive due process claims are not ripe.
 
 
 25
 As for plaintiffs' claim that they were denied their right to procedural due process, it, too, is premature. We will not evaluate the adequacy of the procedures available to the plaintiffs before they have availed themselves of those procedures. Because neither the Village nor the County has made a final decision regarding a sewer connection for the Unity property, the plaintiffs' procedural due process claim is not ripe. See Kinzli, 818 F.2d at 1456.
 
 B. Antitrust Claims
 
 26
 Our discussion of ripeness in connection with the plaintiffs' equal protection and due process claims applies equally to their antitrust claim. See Suburban Trails, Inc. v. New Jersey Transit Corp., 800 F.2d 361, 368 (3d Cir.1986) (finding, without discussion, that district court's ruling on antitrust issues was premature). We believe that this claim also must await a final decision on the plaintiffs' application for a sewer connection.
 
 
 27
 The plaintiffs in Suburban Trails, two affiliated, privately owned bus companies, were denied federal funds by the defendant, the state agency designated to receive and allocate federal grants under the Urban Mass Transportation Act. There was evidence that the defendant denied the plaintiffs' subsidies because the plaintiffs directly competed with the defendants on one route. The plaintiffs charged that the federal legislation preempted the defendant's action, and also argued that the defendant's conduct violated section one of the Sherman Act and denied the plaintiffs due process of law. The Third Circuit, finding that the Urban Mass Transportation Administration (UMTA) retained the right, not yet exercised, to review and perhaps veto the defendant's allocation plan, held that the plaintiffs' preemption and antitrust claims were not ripe. Administrative proceedings on the plaintiffs' eligibility to receive the federal funds were pending, as was a complaint the plaintiffs had filed against the defendant before UMTA. Even the defendant's decision to deny plaintiffs' subsidy was not yet final.
 
 
 28
 Plaintiffs here assure us that they do not challenge the facial validity of the agreement between Lake County and Grayslake. Rather they challenge the defendants' use of the powers granted them by the contract. It follows that because the defendants have not yet reached a final decision on the plaintiffs' application for a sewer connection, they have not yet exercised these powers. Plaintiffs' antitrust claim thus is premature.
 
 
 29
 It is possible that the plaintiffs will prevail on their application for a sewer connection, should they decide to pursue it further. If so, then they will have suffered no injury from the agreement between Grayslake and Lake County. Even if they do not prevail, however, they may not recover against the defendants based on the alleged anticompetitive agreement, because the defendants are immune from antitrust liability under the state action doctrine.
 
 
 30
 The state action exemption from antitrust liability was established by the Supreme Court in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and extended to local government entities acting "pursuant to state policy to displace competition with regulation or monopoly public service." City of Lafayette v. Louisiana Power & Light Co., 435 U.S 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978). The state's policy must be clearly articulated. Id. at 410; 98 S.Ct. at 1135; Town of Hallie v. City of Eau Claire, 471 U.S. 34, 39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985). In deciding whether a local government's actions are undertaken pursuant to clearly articulated state policy, we "first determine whether any state legislative act(s) authorizes the challenged conduct and then determine whether anticompetitive effects are a foreseeable result of the authorization." LaSalle Nat. Bank v. DuPage County, 777 F.2d 377, 381 (7th Cir.1985), cert. denied, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986). If the answers to both questions are yes, then we conclude that the state intended the local government's action to be immune from antitrust challenge.
 
 
 31
 In LaSalle National Bank, we analyzed the same statutes the defendants cited to the district court in this case. The plaintiffs in LaSalle National Bank, Unity Ventures, William Alter, and the Bank, alleged in their complaint that the defendants had "conspired to unlawfully restrain competition among developers in DuPage County and ... among local governmental units who seek to annex, to tax, to zone, and to provide utility services to developments." Id. at 379. The plaintiffs alleged that the County and the defendant villages reached an agreement whereby each village was given control over access to sewer connections in certain unincorporated areas outside each village, and the County retained control over a portion of the remaining unincorporated areas. The County and each village agreed on a formula for apportioning the limited number of new sewer connections the IEPA would allow. The County was not allocated enough new connections to serve the plaintiffs' proposed development.
 
 
 32
 We found that "[t]he State of Illinois authorizes counties and municipalities to contract together and combine resources for the provision of sewage treatment." Id. at 381 (citing Ill.Ann.Stat. ch. 34, p 3111; Ill.Ann.Stat. ch. 24, p 11-147-4; Ill.Ann.Stat. ch. 111 1/2, p 1046(b)). Moreover, we found express legislative authorization for the IEPA " 'to engage in planning processes and activities and to develop plans in cooperation with units of local government ... in connection with each such unit.' " Id. at 381-82 (quoting Ill.Ann.Stat. ch. 111 1/2, p 1004(n)). Therefore, we found that the defendants' agreements were authorized by the state legislature. Further, we viewed anticompetitive results as a foreseeable consequence of the statutory authorization. Id. at 382.
 
 
 33
 In sum, free competition and competitive pricing are not the policies underlying the Illinois scheme for sewage treatment. Rather the scheme is one in which local governmental units are encouraged to cooperate in providing sewage service to residences within their boundaries for the common good of the communities they serve. These local and regional decisions regarding sewage treatment are guided by political forces, minimal judicial review, see Krol v. County of Will, 38 Ill.2d 587, 590, 233 N.E.2d 417 (1968), and state and national environmental protection laws. Under such a scheme anticompetitive effects are clearly foreseeable and contemplated. We therefore hold that the defendants' agreement allocating sewage treatment capacity was authorized and that the Illinois legislature intended that such cooperative agreements not be the subject of federal antitrust suits.
 
 
 34
 Id.
 
 
 35
 The district court found that LaSalle National Bank was controlling on this suit. Unity Ventures, 631 F.Supp. at 191. It found that the agreement between Lake County and Grayslake was authorized by the same statutes as we relied on in LaSalle National Bank. Unity Ventures, 631 F.Supp. at 190. And the restraint of competition was a foreseeable result of the authorizing legislation. Were the antitrust claim not premature, we would affirm the district court's judgment that because the state action doctrine applies to the actions of the local governments here, "the jury's verdict and award for the federal antitrust action must be vacated and the action dismissed." Id. at 191.
 
 IV. CONCLUSION
 
 36
 In light of the foregoing discussion, we affirm the district court's grant of defendant's motion for judgment notwithstanding the verdict.[3] Costs in this court are waived.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 On December 22, 1986, judgment was entered for defendants (plaintiffs in this case). People ex rel. Foreman v. Village of Round Lake Park, No. 81 CH 392 B (19th Cir.Ct., Lake Cty., Ill. Dec. 22, 1986). According to the plaintiffs in this case, the judgment has been appealed to the Illinois Appellate Court for the Second District
 
 
 [2]
 Because the plaintiffs invoke no fundamental right and posit no suspect classification, they are not entitled to the higher level of scrutiny that attaches to those kinds of equal protection claims. See, e.g., Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). The parties here seem to agree that the same standards apply in the ordinary equal protection analysis as apply to substantive due process challenges. See, e.g., Griffin High School v. Illinois High School Ass'n, 822 F.2d 671, 674-76 (7th Cir.1987). The regulation must bear a rational relation to a legitimate state interest. Id
 
 
 [3]
 In light of our holding that plaintiffs' claims were not ripe for adjudication, we do not reach defendants' cross-appeal. We also need not rule on the parties' various motions to strike portions of each others' briefs which do not bear on the ripeness issue, except to deny plaintiffs' request for attorneys' fees
 We acknowledge the four amicus curiae briefs filed in support of the defendants-appellees by the State of Illinois, the National Institute of Municipal Law Officers, the National Association of Counties, and the Northeastern Illinois Planning Commission, the National Association of Regional Councils, the American Planning Association, and the Metropolitan Housing and Planning Council.